## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, LaNard Taylor, Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, deposes and states under penalty of perjury that the following is true to the best of my information, knowledge and belief.

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a criminal complaint alleging that JIMMIE LEE LITTLE ("LITTLE"), residing in Fort Worth, Texas, conspired with others known and unknown to restrain trade in violation of 15 U.S.C. § 1.

2. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June of 2016. I am presently assigned to the Washington Field Office's International Corruption Squad, where I am responsible for investigating Antitrust, Foreign Corrupt Practices Act, and Kleptocracy violations. I was previously assigned to the FBI's Los Angeles Field Office, where I was responsible for investigating public corruption, fraud against the government, violent crime, narcotics offenses, and a host of other violations of federal law. Prior to my employment with the FBI, I was a law enforcement officer in the State of Florida for four years, where I investigated crimes relating to fraud, narcotics, violent crimes, and a variety of other criminal acts.

3. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in relevant part that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." Specifically, the Sherman Act prohibits any conspiracy, agreement, understanding, plan or scheme, between two or more competitors to: (a) raise, lower, maintain, set a floor, or in any other way affect, prices; (b) rig bids (that is, an agreement among bidders, pursuant to which bids are submitted to, or withheld from, a third party); and (c) allocate or divide up customers or territories. Any such agreement is illegal, even if it is never carried out or is unsuccessful. The agreement itself is the crime. The elements of this crime are generally: (1) a conspiracy to rig bids, fix prices, or allocate customers existed; (2) the defendant knowingly engaged in the conspiracy; and (3) the conspiracy affected or occurred within the flow of interstate commerce.

4. I am one of the agents assigned to an ongoing investigation of a price-fixing and bid-rigging conspiracy among suppliers of broiler chickens being conducted by the FBI, United States Department of Commerce Office of Inspector General ("DOC-OIG"), United States Department of Agriculture Office of Inspector General, and Department of Justice Antitrust Division. Since I became involved in this investigation in the fall of 2019, I have conducted and participated in numerous interviews, written and reviewed reports, served subpoenas, executed warrants, and reviewed relevant documents, among other things.

5. As set forth in greater detail below, I submit there is probable cause to believe that from at least as early as 2012 and continuing through at least early 2017, LITTLE, together with co-conspirators known and unknown, entered into and engaged in a continuing combination and conspiracy to suppress and/or eliminate competition by rigging bids, fixing prices and other

3

price-related terms, including discount levels, for broiler chicken products in violation of 15 U.S.C. § 1.

6. The facts in this affidavit come from my review of the evidence, my personal observations, my training and experience, and information obtained from other agents and witnesses. Except as explicitly set forth below, I have not distinguished in this affidavit between facts I have personally observed and facts I have learned from others. This affidavit is intended to show simply that there is sufficient probable cause for the requested criminal complaint and does not set forth all of my knowledge about this matter.

## THERE IS PROBABLE CAUSE TO BELIEVE THAT LITTLE CONSPIRED TO FIX PRICES AND RIG BIDS IN THE BROILER CHICKEN INDUSTRY

### *Background*

7. Broiler chickens are chickens raised to provide meat for human consumption. Several companies ("Suppliers") produced broiler chicken products in the United States for sale either directly or indirectly (such as through a distributor and a distribution center) to restaurants, grocery retailers, and others.

8. Suppliers of broiler chicken products included:

   a. Supplier-1, a publicly traded corporation headquartered in Greeley, Colorado.

   b. Supplier-2, a privately held corporation headquartered in Claxton, Georgia.

   c. Supplier-3, a publicly traded corporation headquartered in Springdale, Arkansas.

   d. Supplier-4, a privately held corporation headquartered in Troutman, North Carolina.

   e. Supplier-5, a privately held corporation headquartered in Park Ridge, Illinois.

   f. Supplier-6, a privately held corporation headquartered in Springdale, Arkansas.

   g. Supplier-7, a privately held corporation headquartered in Gainesville, Georgia.

9. Restaurants, grocery retailers, and others who purchased large volumes of broiler chicken products generally received bids from or negotiated prices and other price-related terms, including discount levels, with Suppliers directly or, in the case of some fast-food restaurants, also known as quick-service restaurants, having many independent franchisees, through a

4

centralized buying cooperative. QSR-1 negotiates pricing through a centralized buying cooperative: Cooperative-1. QSR-4[1] negotiates pricing directly.

10. Some purchasers of broiler chicken products used a "cost-plus" pricing model for 8-piece bone-in broiler chicken products (alternatively called "8-piece COB" for 8-piece chicken-on-the-bone) that varied month-to-month or period-to-period depending on the price of chicken feed, which also provided suppliers with a per-pound margin.

11. Bidding and negotiations usually occurred annually toward the end of the calendar year and established prices and other price-related terms, including discount levels, for the following calendar year. In some instances, however, bidding and negotiation toward the end of the calendar year established prices and other price-related terms, including discount levels, for multiple calendar years. In yet other instances, bidding and negotiations occurred throughout the year and sometimes established prices and other price-related terms, including promotional discounts, for discrete periods of time.

## *Pending Charges*

12. On or about June 2, 2020, a Federal Grand Jury in the District of Colorado returned an indictment in case number 1:20-cr-00152-PAB, charging JAYSON JEFFREY PENN ("PENN"), MIKELL REEVE FRIES ("FRIES"), SCOTT JAMES BRADY ("BRADY"), and ROGER BORN AUSTIN ("AUSTIN") with conspiring to restrain trade in violation of the Sherman Act, 15 U.S.C. § 1. The indictment alleges that PENN, FRIES, BRADY, and AUSTIN, together with co-conspirators known and unknown, entered into and engaged in a continuing combination and conspiracy to suppress and eliminate competition by rigging bids, and fixing prices and other price-related terms for broiler chicken products sold in the United States. The indictment is attached and incorporated hereto as Exhibit 1.

## *Relevant Persons*

13. PENN, AUSTIN, and LITTLE were employed by Supplier-1 during all or part of the period of the conspiracy. PENN was an executive vice president at Supplier-1 starting in approximately January 2012, and became the President and Chief Executive Officer of Supplier-1 in approximately March 2019. AUSTIN was a vice president at Supplier-1 starting in approximately February 2007. LITTLE was employed by Supplier-1 starting in approximately 2000 until his retirement in approximately 2016[2]. PENN, AUSTIN, and LITTLE had sales functions at Supplier-1. LITTLE reported to AUSTIN and AUSTIN reported to PENN.

14. FRIES and BRADY were employed by Supplier-2 during all or part of the period of the conspiracy. FRIES was a sales manager at Supplier-2 starting in approximately 2004. In

---

[1] The reason this affidavit refers to QSR-1 and QSR-4, but not QSR-2 or QSR-3, is to avoid confusion with the entities labeled QSR-2 and QSR-3 in the Indictment attached as Exhibit 1.
[2] I have seen conflicting documentation as to whether LITTLE retired in 2016 or 2017. Whether he retired in 2016 or 2017 is immaterial to probable cause, so for simplicity I refer to his retirement date as 2016.

5

approximately 2012, FRIES was appointed to Supplier-2's board of directors. In approximately 2016, FRIES became the President of Supplier-2. BRADY was a vice president at Supplier-1 starting in approximately 1999, and a vice president at Supplier-2 starting in approximately August 2012. FRIES and BRADY had sales functions at Supplier-2. BRADY reported to FRIES.

15. Uncharged co-conspirators are identified in this affidavit by unique pseudonyms that indicate where they were employed, *e.g.*, Supplier-3-Employee-1, to maintain their anonymity.

### *Nature of the Conspiracy*

16. LITTLE, PENN, AUSTIN, FRIES, and BRADY, together with their co-conspirators known and unknown, in the State and District of Colorado and elsewhere, participated in a continuing network of Suppliers and co-conspirators, an understood purpose of which was to suppress and eliminate competition through rigging bids and fixing prices and price-related terms for broiler chicken products sold in the United States.

17. They utilized that continuing network:

   a. to reach agreements and understandings to submit aligned, though not necessarily identical, bids and to offer aligned, though not necessarily identical, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States;

   b. to participate in conversations and communications relating to non-public information such as bids, prices, and price-related terms, including discount levels, for broiler chicken products sold in the United States with the shared understanding that the purpose of the conversations and communications was to rig bids, and to fix, maintain, stabilize, and raise prices and other price-related terms, including discount levels, for broiler chicken products sold in the United States; and

   c. to monitor bids submitted by, and prices and price-related terms, including discount levels, offered by, Suppliers and co-conspirators for broiler chicken products sold in the United States.

### *LITTLE's Participation in the Conspiracy*

18. Below I describe several episodes that were part of the conspiracy and in which LITTLE participated. As indicated above, however, my description of these episodes is not meant to describe the entirety of the conspiracy or the entirety of LITTLE's participation in the conspiracy.

### *QSR-4's 2013 Freezing Charge*

19. In or around the Spring of 2013, QSR-4 began formulating a plan to require some of its distribution centers to maintain an inventory of frozen 8-piece and dark meat products on hand at all times to ensure continuity of supply during times of weather calamity, late delivery trucks, spikes in demand, etc. In or around that time, QSR-4 bought broiler chicken products from Supplier-1, Supplier-3, and Supplier-5, among other suppliers.

20.     On or about May 31, 2013, at approximately 2:14 p.m., a QSR-4 employee emailed Supplier-3-Employee-1 asking for prices to supply frozen 8-piece COB and dark meat: "In terms of pricing, what are you thinking on both items? I assume that it will be a formula price based off of the cost plus. Please advise."

21.     The same day, the QSR-4 employee emailed LITTLE: "In terms of pricing, traditionally [Supplier-1] has based the frozen dark meat pricing the same as the fresh dark meat. Will that still be the case? Also, what are you thinking in terms of price for the frozen 8pc?"

22.     Also on or about May 31, 2013, Supplier-3-Employee-1 called LITTLE at approximately 2:24 p.m. (EDT) and 2:40 p.m. (EDT). The respective durations of the calls were approximately 2 minutes and 8 minutes.

23.     Within a minute after the termination of the 2:24 p.m. call, LITTLE told the QSR-4 employee: "Ill have pricing for you Monday. Their will need to be a freezing charge for both." And at approximately 3:38 p.m. (EDT), Supplier-3-Employee-1 reported to his supervisor: "[Supplier-1] told me they would be around .025 to .03 on 8pc & dark meat."

24.     On or about June 4, 2013, Supplier-3-Employee-1 told the QSR-4 employee that there would be freezing charge $0.03/lb. over the regular monthly cost-plus pricing.

### *QSR-4's Quality Assurance Costs for 2014*

25.     In or around December 2013, a QSR-4 employee sent "new QA requirements for 2014" to various Suppliers.

26.     On or about December 21, 2013, a Supplier-3 employee forwarded the requirements to Supplier-3-Employee-1 and said: "It would have been nice to have been forewarned. Wonder how the other suppliers will react?" Supplier-3-Employee-1 responded: "I would be surprised if they don't say something. Might call a couple of them and ask."

27.     On or about December 23, 2013, at approximately 10:45 a.m. (EST) Supplier-3-Employee-1 called LITTLE. The duration of the call was approximately 5 minutes.

28.     On or about December 24, 2013:

    a.     At approximately 12:57 p.m. (EST) LITTLE called Supplier-5-Employee-1. The call lasted for approximately 3 minutes.

    b.     At approximately 1:10 pm (EST), Supplier-5-Employee-1 emailed pricing for Supplier-1, Supplier-3, and Supplier-5 to another employee at Supplier-5 and said: "here's why [Supplier-3] is so popular with [QSR-4]."

    c.     At approximately 1:32 pm (EST) LITTLE sent an email to two employees at Supplier-1 stating "FYI … I did find out [Supplier-3's] fob price is $0.025 lower than ours in 2014!"

7

29.     On or about December 26, 2013 Supplier-3-Employee-1 emailed colleagues at Supplier-1: "Talked to Jimmy Little and he said they were planning on adding to their cost to do this. They also didn't like it just showing up also."

30.     In or about January 26, 2014, Supplier-3-Employee-1 sent Supplier-3's February 2014 pricing to QSR-4 and included a quality assurance audit cost of $0.0009/lb.

### *QSR-1's 8-Piece COB Supply for 2015*

31.     For calendar year 2014, the Suppliers' prices for 8-piece COB sold directly or indirectly to QSR-1 franchisees included the following margins:

| Supplier | CY 2014 Margin |
| --- | --- |
| Supplier-1 | $.1175/lb. |
| Supplier-2 | $.0673/lb. |
| Supplier-3 | $.0750/lb. |
| Supplier-4 | $.1100/lb. |
| Supplier-5 | $.0900/lb. |
| Supplier-6 | $.0967/lb. |
| Supplier-7 | $.0900/lb. |

32.     On or about August 2014, a Cooperative-1 employee instructed Suppliers to submit a proposed cost-plus pricing model for calendar year 2015 by on or about August 19, 2014.

33.     On or about August 18, 2014:

a.     The following phone calls occurred:

| Approx. Time (EDT) | Call Initiator | Call Recipient | Approx. Duration (min.) |
| --- | --- | --- | --- |
| 9:41 a.m. | LITTLE | Supplier-5-Employee-1 | 7 |
| 10:34 a.m. | LITTLE | AUSTIN | 6 |
| 12:04 p.m. | AUSTIN | BRADY | 24 |
| 1:25 p.m. | LITTLE | AUSTIN | 11 |

8

| 1:52 p.m. | AUSTIN | Supplier-6 | 2 |
| 2:03 p.m. | PENN | AUSTIN | 6 |
| 2:41 p.m. | LITTLE | Supplier-3-Employee-1 | 11 |
| 2:58 p.m. | Supplier-1-Employee-6 | BRADY | 14 |
| 3:21 p.m. | AUSTIN | LITTLE | 17 |
| 5:56 p.m. | Supplier-1-Employee-2 | AUSTIN | 2 |

      b.     At approximately 6:01 p.m. (EDT) Supplier-1-Employee-2 emailed a spreadsheet to PENN containing the following chart:

|  | **Current M** | **New Marg** |
|---|---|---|
| **[Supplier-5]** | 0.09 | 0.22 |
| **[Supplier-4]** | 0.11 | 0.22 |
| **[Supplier-2]** | 0.0675 | 0.22 |
| **[Supplier-6]** |  | .15-.18 inc |
| **[Supplier-7]** | 0.1 | 0.23 |

      c.     At approximately 6:46 p.m. (EDT) Supplier-1-Employee-2 emailed PENN:

        i. Supplier-1-Employee-2 said "Roger did some checking around today and I included the below regarding the range of the total increases (margin and costs) folks are going in with," and then reported the numbers to PENN: Supplier-2 at .14-.16/lb., Supplier-4 at .13-.15/lb., Supplier-5 at .14-.16/lb., Supplier-6 at .15-.17/lb., and Supplier-7 at .14-.16/lb.
        ii. Supplier-1-Employee-2 also said "Considering the numbers above and the fact that we wanted to be the leader this would put us in at .1616/lb increase (.06 in cost and .10 in margin) which would equate to about $400k in additional revenue on equal volume from this year."

    34.     On or about August 20, 2014, Suppliers submitted proposed cost-plus pricing models to Cooperative-1 with the following proposed margins or effective margins:

9

| Supplier | CY 2014 Margin | Proposed Margin |
| --- | --- | --- |
| Supplier-1 | $.1175/lb. | $.2175/lb. |
| Supplier-2 | $.0673/lb. | $.2200/lb. |
| Supplier-3 | $.0750/lb. | $.1600/lb. |
| Supplier-4 | $.1100/lb. | -- |
| Supplier-5 | $.0900/lb. | $.2200/lb. |
| Supplier-6 | $.0967/lb. | $.2070-$.2174/lb. |
| Supplier-7 | $.0900/lb. | $.2300/lb. |

35.   On or about August 20, 2014, the following email exchange occurred:

| Email Initiator | Email Recipient | Content |
| --- | --- | --- |
| Supplier-1-Employee-2 | AUSTIN | "Any word from them on our proposal?" |
| AUSTIN | Supplier-1-Employee-2 | "I heard they made a couple of calls and were surprised." |
| Supplier-1-Employee-2 | AUSTIN | "Surprised like how much higher everyone else was?" |
| AUSTIN | Supplier-1-Employee-2 | "Yes" |

36.   In calendar year 2015, including as late as approximately December 26, 2015, Supplier-1 sold and accepted payment for 8-piece COB through a distributor to QSR-1 franchises in the United States at a margin of $.2175.

*Continuation of the Conspiracy Into At Least 2017*

37.   LITTLE retired from Supplier-1 in approximately 2016, but as further described in the Indictment, his co-conspirators continued to act in furtherance of the conspiracy into at least 2017.

10

*QSR-1's Broiler Chicken Products for 2018*

38. In or around January 2017, Cooperative-1 was negotiating with Suppliers for 2018 broiler chicken products. On or about Monday, January 16, 2017, between approximately 2:40 p.m. (EST) and approximately 4:51 p.m. (EST), there were at least 5 phone calls between BRADY and AUSTIN. The cumulative duration of the calls was approximately 15 minutes.

39. On or about Tuesday, January 17, 2017:

   a. At approximately 10:11 a.m. (EST), AUSTIN called BRADY. The duration of the call was approximately 2 minutes.

   b. At approximately 5:54 p.m. (EST) AUSTIN told Supplier-1-Employee-4, "[Supplier-2] meets with [Cooperative-1] in [sic] Thursday and i will get a blow by blow Friday morning. [Supplier-5] meets with [Cooperative-1] in [sic] Friday."

40. On or about Thursday, January 19, 2017, Supplier-2 met with Cooperative-1.

41. On or about Friday, January 20, 2017, at approximately 3:12 pm (EST), AUSTIN called BRADY. The duration of the call was approximately 7 minutes.

42. On or about January 27, 2017, Supplier-1 met with Cooperative-1.

**STATEMENT OF PROBABLE CAUSE**

For the reasons set forth above, I submit there is probable cause to believe that LITTLE together with co-conspirators known and unknown, entered into and engaged in a continuing combination and conspiracy to suppress and/or eliminate competition by rigging bids, fixing prices and other price-related terms, including discount levels, for broiler chicken products in violation of 15 U.S.C. § 1.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully Submitted,

/s/ LaNard Taylor_____
LaNard Taylor
Special Agent
Federal Bureau of Investigation

Sworn to before me this __23rd__ day of September 2020.

_____
Hon. S. Kato Crews
United States Magistrate Judge

**Reviewed and submitted by Michael Koenig and Heather Call, Trial Attorneys, Antitrust Division, United States Department of Justice**

11